IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Kathy E. Walden, | ) | C/A No.: 3:06-cv-310-CMC |
| | ) | |
| Plaintiff, | ) | OPINION AND ORDER |
| | ) | |
| vs. | ) | FINDINGS OF FACT |
| | ) | AND |
| Rexam, Inc.; Local 650, United Steel | ) | CONCLUSIONS OF LAW |
| Workers, a labor union; Rexam Pension | ) | REMANDING FOR FURTHER |
| and Benefits Committee; and Liberty | ) | CONSIDERATION |
| Mutual Insurance Company, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Through this action, Plaintiff, Kathy E. Walden ("Walden"), a former employee of the

American National Can Company ("ANCC"), seeks a determination that her pension benefit plan

administrator abused its discretion when it denied her claim for disability retirement benefits under

the ANCC Industrial Pension Plan #1 ("Pension Plan"). The ultimate denial decision was issued

on October 23, 2006, after remand by this court for further proceedings. *See* Dkt No. 42 (August

3, 2006 docket text order remanding for further review).

Sometime after Walden's last day at work, ANCC was acquired by Rexam, Inc., which

assumed responsibility for administering the Pension Plan. The October 23, 2006 decision denying

benefits was issued by Rexam, Inc., which acted, in part, through the Rexam Pension and Benefits

Committee (collectively "Rexam").[1]

---

[1] Two other Defendants reflected in the caption have been dismissed without prejudice. *See*
Dkt Nos. 52 (dismissing Local 850, United Steel Workers, a labor union) & 53 (dismissing Liberty
Mutual Insurance Company).

The Pension Plan is an employee pension benefit plan as that term is defined by ERISA, 29 U.S.C. § 1002(2)(a), *et seq*. Although originally adopted by ANCC, it is currently sponsored and funded by Rexam, Inc.

The parties have stipulated that Walden exhausted all plan remedies as to Rexam's final denial issued on October 23, 2006. Dkt No. 59 at ¶ 2. That decision is now before the court for a determination on the merits based on the parties' written submissions. *See* Dkt No.59 ¶ 8 (joint stipulation agreeing to disposition on the written record).[2]

The parties have stipulated to the majority of the record, which has been filed in multiple subparts. In addition, the court has, over Plaintiff's objection, allowed other evidence to be filed as a supplement to the administrative record. The collective record relevant to the Pension Plan's final decision is found at docket numbers 60-61, 63, 75-78. All pages contained within the record before the Pension Plan (as well as some additional materials which are not part of that record but which may bear on peripheral issues) have been sequentially numbered with the prefix "R/W" and are referred to by that number in this order. The parties have also submitted a number of other exhibits to motions which deal primarily with communications between counsel and, while part of the record before this court, are not part of the record reviewed for purposes of this decision.

---

[2] The parties filed cross-memoranda in support of judgment on February 9, 2007. Dkt No. 58 (Rexam) & 64 (Walden). The parties also filed responsive memoranda on February 16, 2007. Dkt No. 67 (Rexam) and 66 (Walden). Rexam filed a sur-reply on March 5, 2007. Dkt No. 79. Other briefing was filed during the same time frame relating to motions to supplement the record and to compel discovery responses. As noted above, the motion to supplement the record was granted. *See* Dkt No. 74 (order granting motion to supplement). The motion to compel was mooted and argument contained in related memoranda was stricken to the extent it related to the merits. *See* Dkt No. 87 (striking arguments irrelevant to the motion to compel).

For the reasons set forth below, the court finds that the Pension Plan's most recent denial is not fully supported given its failure to adequately explain its reasons for finding that Walden, though totally disabled from May 14, 1997, through February 1999, became capable of performing at least sedentary work on March 1, 1999.  Neither, however, is the record so clear as to warrant this court directing Rexam to award Walden the benefits she seeks.   Moreover, the court finds no improper motivation or bad faith on the part of Rexam such as might preclude remand, although it does find the most recent review to have been superficial and, therefore, defective.  The court, therefore, remands the matter for further consideration under expedited procedures set forth at the conclusion of this order.

## APPLICABLE LAW AND STANDARD OF REVIEW

It is undisputed that the benefits at issue are provided under an employee pension benefit plan governed by the Employee Retirement Income and Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA").   Walden's claim for benefits is, therefore, pursued solely under 29 U.S.C. § 1132(a)(1)(B).

It is also undisputed that the Pension Plan's benefits determination is subject to an abuse of discretion standard of review.  Joint Stipulation ¶ 3.  The parties have stipulated that the standard should be modified due to a conflict of interest.[3]

---

[3] Given the parties' stipulation, the court will apply the modified abuse of discretion standard of review.  The court notes, nonetheless, that this standard is not automatically applied simply because the Pension Plan is self-funded.  *See Donovan v. Eaton Corp., Long Term Disability Plan*, 462 F.3d 321, 326 (4th Cir. 2006)(recognizing that self-funding by a welfare benefits plan does not, alone, require application of the abuse of discretion standard of review); *Colucci v. Agfa Corp. Severance Pay Plan*, 431 F.3d 170 (4th Cir. 2005) (same).

Under the basic abuse of discretion standard of review, the court is required to uphold the administrator's decision if it is reasonable, even if the court would have come to a different conclusion had it considered the matter independently. *See Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997). A decision is reasonable if it is "the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Id*. at 232 (quoting *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997)).

Numerous factors are considered in "determining the reasonableness of a fiduciary's discretionary decision." *Booth v. Wal-Mart Stores, Inc. Assocs. Health and Welfare Plan,* 201 F.3d 335, 342-43 (4th Cir. 2001). These include:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Id.*

The modified abuse of discretion standard of review considers the same factors but, as suggested by the eighth *Booth* factor, requires the court to reduce its deference as necessary to balance any conflict of interest under which the benefits plan may be operating. *See Bailey v. Blue Cross & Blue Shield of Virginia,* 67 F.3d 53, 55 (4th Cir. 1995). Under this standard, the court reduces its deference only to the extent necessary to neutralize any untoward influence and, ultimately, determines whether a fiduciary, acting free from a conflict, would have been reasonable in making the same decision.

4

## ARGUMENTS AND SCOPE OF DECISION

Rexam's October 23, 2006 decision denying Walden's claim for disability pension benefits is the only decision before the court. *See* R/W 719-23 (denial letter). That denial was based on Rexam's conclusions that Walden: (1) was disabled from May 14, 1997 though February 1999; (2) did not, thereafter, meet the Pension Plan's definition of disability; and (3) was not entitled to disability pension benefits for the period during which it concluded Walden was disabled because she received benefits under as separate short-term disability plan ("STD Plan") for that full period.[4]

Walden agrees with the first conclusion to the extent it finds that she was disabled from May 14, 1997 through February 1999. She disagrees, however, with Rexam's conclusion that her disability ended during February 1999. Rexam's first conclusion is, therefore, considered here only to the extent it bears on the second conclusion: that Walden ceased being disabled at some point during February 1999.

In challenging the latter conclusion, Walden asserts that her medical records from the winter of 1999 though March 2002 demonstrate that she remained totally disabled from any occupation through the end of the five-year period after she ceased active employment.[5] Walden relies, in particular, on two letters and related statements signed by Steven Poletti, M.D. in February 2000 and February 2001. Dr. Poletti opined, in both of these letters, that Walden was totally disabled. *See* R/W 111-12 (February 18, 2000 letter signed by Dr. Poletti); R/W 101 & 40-45(February 7, 2001

---

[4] The court recognizes that the characterization of the separate disability plan as a "short-term disability plan" may not be entirely accurate. The reference to the STD Plan as such is, however, used in this order to distinguish benefits under that plan from the disability-retirement benefits available under the Pension Plan.

[5] To qualify for the disability pension benefit, an employee must become disabled within the five years following their last day of active work.

5

letter and Attending Physician's Statement of Functional Capacity and related documents signed by Dr. Poletti). Walden also relies on a December 21, 1998 determination by the Social Security Administration ("SSA") that she was totally disabled from April 1, 1997 through the date of the SSA decision and continuing thereafter.

In addition, Walden challenges Rexam's reliance on a functional capacity evaluation done in August 2002. This challenge is based primarily on the timing of the FCE, which was completed several months after the conclusion of the five-year period during which Walden must first have become totally disabled to be entitled to disability retirement benefits.

As to Rexam's third point, Walden asserts that she did not receive benefits under the STD Plan for the full period from May 1997 to February 1999. She concedes that receipt of benefits from the STD Plan would preclude her from receiving Pension Plan benefits for the same period and acknowledges that she did receive payments during the first year of this period. She argues, nonetheless, that she did not receive all benefits for the full period because the STD Plan stopped sending her checks after April 2, 1998.

Thus, Walden claims she is still "due" a years worth of benefits under the STD Plan. Dkt No. 66 at 1 (Plaintiff's reply). This would be more accurately stated as a claim that she is due benefits under the *Pension Plan* based on a defect in the factual foundation for its claim that she received benefits from the STD Plan during the relevant period (April 1998 through February 1999).[6]

_____

[6] The only claim asserted in this action is the claim for benefits under the Pension Plan. Thus, the court cannot entertain any claim for benefits due under the STD Plan. Non-payment under the STD Plan is, nonetheless, relevant to the Pension Plan claim in light of Rexam's assertion that no benefits are due under the Pension Plan *because* Walden received benefits for the same period under the STD Plan.

While conceding that no checks were issued after April 2, 1998, Rexam maintains that Walden received all that she was due (and more) under the STD Plan. This argument rests on provisions of the STD Plan which allow for offset of Social Security Disability Income ("SSDI") benefits, subject to certain allowances (*e.g.,* for attorney's fees).[7]

In light of the matters which have been conceded, the court limits its review to the following issues: (a) whether, in light of Rexam's concession that Walden was disabled from May 1997 though February 1999, it abused its discretion in finding that Walden ceased being disabled thereafter; and (b) whether Walden received benefits under the STD Plan for the full period May 1997 through February 1999, thus precluding her from receiving benefits for the same period from the Pension Plan.

Unfortunately, the record remains insufficient for the court to answer either question. The court, therefore, again remands with specific instructions. The court will, nonetheless, make such findings and issue such conclusions as are possible at this point in the proceedings, both to guide the parties and to aid the court in its final determination should that be necessary after the second remand.

## DECISION OF THE COURT

After examining the administrative record, joint stipulation, and parties' memoranda, the court enters the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the

---

[7] It is undisputed that: Walden was awarded SSDI benefits in December 1998 based on a finding of disability beginning April 1, 1997; she received a lump sum award for retroactive SSDI benefits at or around the time the award was issued; and this requires some offset against the earlier benefits received from the SSDI Plan. What is in dispute is whether proper application of the offset resulted in Walden receiving a net overpayment under the STD Plan.

Federal Rules of Civil Procedure.  To the extent that any findings of fact represent conclusions of law, or vice-versa, they shall be so regarded.

## FINDINGS OF FACT

**A.    Disability from May 1997 through present.**

1.    Walden suffered from a back problem which led her to cease work in March 1997. She underwent surgery on her back on May 14, 1997.  She was recovering well from that surgery[8] when she was injured in an automobile accident in July 1997.  R/W 725 (Dr. Plunkett summary of Walden's medical history); R/W 728 (Liberty Mutual summary of medical history).

2.    Since the automobile accident, Walden has suffered significant difficulties with her back.  During all times relevant to this decision, those difficulties prevented her from returning to her former occupation which involved frequent lifting of twenty pounds and occasional lifting of fifty pounds.  R/W 725  (Dr. Plunkett summary of Walden's medical history addressing prior work requirements); R/W 728 Liberty Mutual (addressing medical history and grant of benefits under STD Plan).

3.    Walden received ongoing treatment for her back problems including a second surgery on October 31, 1997.  *See* R/W 730 (Liberty Mutual summary of medical history).

4.    From October 1998 through at least August 2001, Walden received treatment for her back pain from Carolina Pain Specialists ("CPS").  R/W 54-91.  Her self-reports of the level of pain were frequently at a level of ten on a one-to-ten scale, including throughout the period immediately before and after Rexam claims she ceased to be disabled.  The CPS records are discussed in more detail below.  *See* Findings of Fact § A ¶ 17.

_____

[8]  In June 1997, Walden reported that she was walking seven miles a day.

8

5.    In its October 23, 2006 decision, Rexam conceded that Walden was "permanently and totally disabled for the period May 14, 1997 through February 1999," and the court so finds. R/W 722 (final decision letter dated October 23, 2006).  *See also* R/W 725 (third-party medical review by F.X. Plunkett, M.D. stating that "[f]rom 05/14/97 through 02/1999 [Walden] was totally and completely disabled"); R/W 730 (Liberty Mutual's October 20, 2006  report to Pension Plan concluding that Walden "was totally and completely disabled from May 14, 1997 through February 1999").

6.    In December 1998, Walden was awarded Social Security Disability Income ("SSDI") based on a finding that she had been disabled since April 1, 1997.  R/W 48-51.[9]  In finding Walden disabled, the Administrative Law Judge ("ALJ") whose decision became that of the Commissioner stated: "I find the claimant's testimony to be consistent with the medical records and credible. Therefore, I give little weight to the opinion of the State agency medical consultants in this case." R/W 50.  The ALJ did not otherwise reveal the content of the reports of the state agency consultants, although  it appears from his reference to them that they did not favor a finding of total disability.[10]

7.    In its October 2006 denial, as in its earlier denials, Rexam relied predominantly on a Statement of Examining Physician completed in February 1999 by W. Randall Westerkam, M.D. ("Westerkam Report").  *See, e.g.,* R/W 726 (Dr. Plunkett report referring solely to the Westerkam

---

[9]  In one or more of her memoranda, Walden asserts that her SSDI benefits have since been reviewed and reaffirmed.  The administrative record does not, however, contain any evidence of such review and reaffirmation.

[10]  Only the ALJ decision was made part of the administrative record.

9

Report as the basis for his determination that Walden ceased being disabled in February 1999).[11]

In this report, Dr. Westerkam indicated Walden had a "partial disability, indefinite" with a prognosis

for recovery of "fair to good." R/W 151.

   8.   Although Walden disagrees with the adequacy of his evaluation, it is apparent that

Dr. Westerkam was chosen by Walden or by someone acting on her behalf. As Walden explained

in a November 16, 2001 letter to Rexam:

> I realized my Pain Management Doctor was not qualified to fill out these forms and
> he referred me to Dr. Randy Westercam [sic] who is a rehabilitative doctor. I saw
> Dr. Westercam [sic] in February of [19]99 and he gave me a partial disabililty with
> limitations and restrictions. . . . I realized that this opinion . . . was an unfair
> assessment of my condition and I followed up with a second opinion. I made an
> appointment with a spinal surgeon, Dr. Steven Poletti of Carolina Spine in February
> of 2000.

R/W 37. From what is present in the records (only the Westerkam Report itself, not any underlying

notes or records), it does appear that Dr. Westerkam's evaluation was fairly limited. *See* R/W 151-

53.

   9.   As noted in Walden's November 16, 2001 letter, Walden visited Dr. Poletti for a

"second opinion" roughly a year after seeing Dr. Westerkam. *See* R/W 37 (Walden letter); R/W

111-12 (Dr. Poletti February 2000 Report). Dr. Poletti's February 2000 Report indicates that he saw

Walden "in self-referral for evaluation of low back pain and left leg pain. R/W 111. While written

in a more narrative form than Dr. Westerkam's Report and arguably containing somewhat more

detail, this first Poletti Report also appears rather superficial. *See* R/W 111-12. For example, Dr.

Poletti summarized Walden's medical history in one paragraph and his examination of her in

---

   [11]   Dr. Plunkett is a board certified orthopedic surgeon, licensed as a physician in
Pennsylvania. Due to confusion relating to a temporary Graduate Medical Trainee license issued
while he was a resident, Walden incorrectly suggested that Dr. Plunkett was not a licensed physician.

another.  In the latter, he reported primarily matters which would not necessarily be indicative of any significant disability: (1) several well-healed scars; (2) some limited flexion and an unspecified level of pain on extension; (3) patellar tendon reflex and EHL strength "which may be slightly diminished"; and (4) "dysesthesia in the posterolateral aspect of her leg."  He also referred to the absence of certain negative indications. (e.g. "no ankle edema" and "no change in peripheral pulses").  Dr. Poletti then opined, without further explanation, that Walden "meets the criteria for full disability."  He did not, however, indicate what criteria he was applying.  Dr. Poletti also noted that Walden had been awarded SSDI but not "disability through her prior employer."  R/W 112.  In his continuing comments he discussed several specific limits such as an inability to sit for more than thirty minutes at a time and a contraindication of "any type of standing, bending, pushing, or pulling any type of repetitive basis," which, again, would not necessarily support a determination that she was incapable of any form of work.   He also opined that Walden's "situation is not likely to improve in the future."  Dr. Poletti concluded that Walden "absolutely meets the criteria for off duty status and should be awarded any compensation if such a policy exists."  R/W 112.    As with his reference to "disability criteria," he offered no explanation of the criteria he was applying for "off duty status."

10.    Although Walden suggests in one of her memoranda that Dr. Poletti was a treating physician and that she had been to him multiple times, the medical records indicate that Walden's February 2000 visit with Dr. Poletti for a "second opinion" as to the degree of her disability was her first visit with him.  There are no supporting notes or records to indicate the extent of Dr. Poletti's evaluation on that date beyond what is contained in the two page report itself.

11.     Walden visited Dr. Poletti for what was apparently only the second time on February 7, 2001.  *See* R/W 110 (Dr. Poletti's February 7, 2001 letter).  In two forms completed on this date, Dr. Poletti repeatedly stated that Walden was "disabled permanently & totally," using several variations of the same phrase.  R/W 40, 41 & 43.   Notably, these conclusory statements are repeatedly offered as the sole response to a request for an "explanation" of any indicated restrictions, thus resulting in an absence of any substantive explanation.  These and other cursory or incomplete responses, as well as an accompanying cover letter from Dr. Poletti, suggest that he believed his prior opinion was found insufficient only because he had failed to invoke the proper words in describing Walden's disability.

12.     Walden was also evaluated in New Jersey in March 2001, by Sharon C. Worosilo, M.D.  Dr. Worosilo, who was apparently consulted in connection with litigation relating to the automobile accident, opined that Walden was disabled as a result of her automobile accident.  Dr. Worosilo did not, however, indicate a degree of disability or apply any specified criteria.  Dr. Worosilo noted that Walden reported her pain level as ten on a one-to-ten scale.  R/W 114-17 (also noting that Walden had just completed a ten hour flight itinerary).

13.     From early 1999 through late 2001, Plaintiff made various applications for benefits under the Pension Plan.  These requests were initially denied due to the February 1999 Westerkam Report.  Later denials were based on an erroneous belief that the Pension Plan placed a two-year, rather than a five-year, limit on the date (measured from last day at work) when the disability must have commenced.

14.     As noted in letters from Rexam to Walden, she had not then provided a complete medical record for the Plan to review and there were obvious gaps in the medical record.  Thus, the

12

denial based on the record then before the Plan (including the Westerkam Report) was not unreasonable or suggestive of improper motive. The error as to the period within which the claim must be established was, on the other hand, a clear error in light of the language of the Pension Plan. Nonetheless, the court finds this error to have been the result of confusion rather than intentional. It was, in any case, corrected after Plaintiff made a complaint to the South Carolina Human Affairs Commission. *See* R/W 98-99.[12]

15.    In February 2002, Rexam wrote Walden explaining the reasons for the denial. R/W 98-99. This letter explained the inadequacies in the record and provided Walden with a further opportunity to submit materials in support of her claim. Walden provided further support, primarily Dr. Poletti's second report which Rexam again found inadequate. R/W 22-25.

16.    In light of Rexam's continued position that her support was inadequate, Walden requested and Rexam agreed to pay for an independent FCE. R/W 1 & 26; Dkt No. 66 n. 13 (Walden stating that she "actually requested, and was insistent upoin getting, the FCE" but could not afford to pay for it herself). That FCE was completed in August 2002. It appears from the record to have been carefully and thoroughly completed. R/W 2-21. It concluded that Walden was, as of the date of the FCE, capable of performing a sedentary occupation. R/W 2.[13]

---

[12]   Rexam was, at that point, administering multiple plans, at least one of which had a two-year limit on similar disability benefit applications. The five-year limit appeared in the Pension Plan of ANCC, the acquired company which had employed Walden. There is no evidence that Rexam's misinterpretation of the ANCC Pension Plan was intentional.

[13]   This FCE was completed in August 2002, several months after the conclusion of the relevant five-year period. Thus, it would not necessarily be determinative of Walden's condition during the relevant five-year period or, more critically, her condition when Rexam claims she ceased to be disabled (February 1999). This is not to say that it might not be some evidence of Walden's earlier condition, depending on whether her condition was one likely to improve or become progressively worse. These matters have simply not been addressed within the Plan's internal process.

17.     Because they are the primary treatment records covering the period when Rexam maintains Walden ceased to be disabled, the court will summarize the medical records from Carolina Pain Specialists ("CPS").

    a.     Walden's back pain was treated with a variety of modalities including medications, injections and a spinal cord stimulator.[14]  *Id.*

    b.     The CPS records indicate that, in October 1998, Walden reported that her pain was, on average, an eight on a one-to-ten scale.  At that time, she indicated that her pain was a "little better and ha[d] become bearable with meds and injection."  R/W 57.  She compared her pain relief from treatment as of that day, relative to earlier dates, as 25% better and reported sleeping eight to ten hours each night.  R/W 57.  At her next visit, on December 16, 1998, she reported her pain as a ten on a one-to-ten scale and described her percentage pain relief that day as "0%."  Nonetheless, she still reported getting eight to ten hours of sleep per night.  R/W 58.  Both of these visits are within the few months before Rexam maintains Walden ceased to be disabled.

    c.     The next CPS record is for a March 17, 1999 visit, shortly after the point in time when Rexam asserts Walden ceased to be disabled.  During this visit, Walden again described her pain level as a ten on a one-to-ten scale.  She also again reported receiving "0%" relief from treatments.  She indicated that she was only getting five to six hours sleep

---

[14]  The spinal cord stimultor was inserted in November 1999 (well after Rexam maintains Walden ceased to be disabled) and removed on July 30, 2001 (still within the five-year period within which Walden's disability must have commenced) because it was no longer functioning properly. R/W 71 (November 1999 notation of implantation); R/W 92-93 (Lexington Medical Center record of removal in July 2001).

14

per night. R/W 59. Placement of a spinal stimulator was discussed during this visit, further suggesting that the pain relief modalities then being used were not effective. *Id.* CPS related medical records from the Lexington Medical Center for the same month indicate that Walden received an injection of Depo-Medrol into "each sacroiliac joint on both the right and left sides." R/W 62 (record dated March 30, 1999).

  d.  Walden's next CPS record is for a April 21, 1999 visit. This record indicates that she reported that her average pain was still a ten, though it was a nine on that date. R/W 63. Walden also indicated receiving 25% relief from pain compared to prior treatments, with the injections providing relief after two days which continued through the date of the appointment. Nonetheless, she reported that she continued to average only five hours sleep each night.

  e.  Records of Walden's June, July and August 1999 CPS visits reflect that she was again reporting a ten level pain, zero relief from treatments, and a continuing reduction of sleep (dropping to only three or four hours a night in the July and August reports). R/W 64-66. Records of a September 1999 visit still report pain on a level of ten, but a 60% pain relief from treatment using a trial electrode placement. R/W 68. Walden reported a return to eight hours sleep per night at this time. *Id.* Records relating to the November 1999 implantation of the permanent spinal cord stimulator indicate that Walden experienced a 50% level of relief with the implant. R/W 71.

  f.  The next record is roughly a year later, on November 1, 2000, when Walden reported: her pain was again a ten; any activity increased her pain; medications were not helping much; and she was only sleeping two to four hours per night. R/W 73. She returned

15

in January, reporting "severe and constant" low back pain, and again in February, reporting that the spinal stimulator was no longer working.  R/W 74-75.  She then continued to be seen every month through August, consistently reporting her pain as a ten.  R/W 76-87.  The records then skip to November 2001, with the same level of pain being reported. R/W 88.

**B.    Offset of Benefits**

1.    Walden received disability benefit checks from the STD Plan from April 1997 through April 2, 1998.  The checks totaled $14,582.82, which was the full amount paid by the STD Plan.    Dkt No. 75 (supplemental joint stipulation attaching R/W 732-771).    After April 1998, Walden did not receive any checks from the STD Plan, apparently based on the STD Plan's conclusion that Walden had received all that she was due in light of offsets against benefits awarded as Social Security Disability Income ("SSDI") benefits.

2.    The STD Plan is apparently designed to work together with SSDI benefits such that there is an initial twenty-six week period during which there is no offset.  Subsequent benefits are offset against any SSDI award, after allowance for attorney's fees.  R/W 849 & 1040.

3.    The Pension Plan, likewise, is designed to work together with the STD Plan, so that Pension Plan benefits are not available for any period during which the employee receives STD Plan benefits.  *See* R/W 595 ("[N]o Employee shall be eligible for a pension . . . while he is receiving Weekly Disability Income Benefits under Part I of the Job and Income Security Plan or similar benefits provided under law").

**CONCLUSIONS OF LAW**

**A.    Entitlement to Disability after February 1999.**

1.    Rexam did not merely concede *for purposes of argument* that Walden *may have been* disabled from May 1997 through February 1999.  Instead, it expressly found Walden *was* totally

16

disabled during this period. It did so based on the reports of Dr. Plunkett and Liberty Mutual which reached this conclusion without any particular explanation. The only basis of disability claimed was a back injury and back pain. Thus, the court begins its analysis by accepting as fact that Walden was disabled by her back condition for the nearly two year period preceding March 1999.

2.    Given Rexam's concession that Walden was disabled prior to February 1999, it follows that there must be some evidence of a change in condition (specifically, an improvement) during or before February 1999 to support the denial of disability benefits after that time.

3.    The only evidence of any improvement in Walden's condition in or around February 1999 is found in the February 1999 Westerkam Report. This single piece of evidence is, in fact, the true (and effectively sole) basis of the denial as revealed by Rexam's October 26, 2006 denial letter. That letter relies on the reports of Liberty Mutual and Dr. Plunkett to establish the end-date for Walden's disability. *See* R/W 722 (Rexam denial). Liberty Mutual, in turn, relied solely on Dr. Plunket who, in turn, relied solely on the Westerkam Report and a subsequent transferable skills evaluation in deciding that Walden's disability ended in February 1999. R/W 730 (Liberty Mutual report–relying on Dr. Plunkett's report for denial recommendation); R/W 726 (Dr. Plunkett report–relying on February 1999 FCE for change in condition). The transferable skills evaluation itself was dependent on the findings in the Westerkam Report. Nowhere in any of these reports or the denial letter does anyone evaluate why the Westerkam Report should be given a dispositive effect.

4.    This is not to say that the Westerkam Report is the only evidence *discussed* in Rexam's final denial letter or the reports on which that letter relied. It remains, however, that Rexam's conclusion that Walden was "totally and permanently disabled under the terms of the

17

Pension Plan [only] for the period May 14, 1997 through February 1999," and, consequently was no longer disabled after February 1999, was "based on the recommendation of Dr. Plunkett and Liberty Mutual." Therefore, despite Rexam's *discussion* (or at least mention) of other evidence in its denial letter, there is no indication of *reliance* on any of this other evidence. Likewise, despite discussion of other evidence in Dr. Plunkett's and Liberty Mutual's reports, it is clear that both, ultimately, rely solely on the February 1999 Westerkam Report for the claimed change in Walden's condition.

5.      The question then becomes whether Dr. Westerkam's FCE is sufficiently strong to support the denial without consideration of other evidence. The court concludes that it is not. As Walden suggests, this report appears to have resulted from a relatively cursory review. At the least, it is not accompanied by evidence of an objective or extensive clinical evaluation. It is also contradicted by other (arguably equally cursory) opinions (by Dr. Poletti).

6.      In light of its superficiality, the court would find the Westerkam Report entitled to little or no weight had it been completed by a physician selected by Rexam (or had it favored Walden). The opposite scenario is, however, presented as it was Walden (or someone acting on her behalf) who arranged for this evaluation. Under these circumstances, it was not unreasonable for Rexam to accord at least some weight to Dr. Westerkam's opinion. Nonetheless, it should not have been given controlling weight without consideration and discussion of the other available evidence relevant to the same time period and continuing through the end of the relevant five-year period.

7.      Apparently the only treatment records covering the critical period (early 1999) are the Carolina Pain Specialists records dated October 1998 through November 13, 2001. These records reflect that Walden was reporting severe pain both before and after February 1999, with the

18

pain increasing rather than decreasing at the very point Rexam decided Walden ceased to be disabled. *See supra* Findings of Fact §A ¶ 17 (Carolina Pain Specialists Records). Given the concession that Walden was disabled through February 1999, these records cannot simply be ignored. While there may be some way to reconcile these records with Westerkam's report, none is offered in Dr. Plunkett's report or in any subsequent discussion by Rexam. Neither does Dr. Plunkett address or explain his reasons for disregarding Dr. Poletti's opinions.

8.    The December 1998 SSDI award constitutes a determination that Walden was, as of December 1998, disabled as defined under the laws and regulations governing Social Security benefits and that this disability extended back to April 1997. To this extent, the SSDI determination and Rexam's decision on remand (that Walden was disabled through February 1999) are consistent. Where there is arguably an inconsistency is the ALJ's determination that Walden's condition was not expected to improve.

9.    Although the decision to award SSDI benefits may be based on a disability definition similar to that found in the Pension Plan, the SSA's decision is not binding on Rexam. *See generally Gallagher v. Reliance Standard Life Ins. Co.,* 305 F.3d 264, 275 (4th Cir. 2002) (declining to require the plan to give substantial weight to the Social Security Administration's disability determination because the plan's disability definition differed from that applied by the SSA); *Elliott v. Sara Lee Corp.,* 190 F.3d 601, 607 (4th Cir. 1999) (noting that while the ALJ's decision as to entitlement to SSDI may be considered as evidence of disability, it is not determinative). Even were the rule otherwise under some circumstances, it would not require a ruling in Walden's favor in this case because the ALJ's decision to award benefits was based on his evaluation of competing evidence. As revealed by his opinion, the ALJ gave more weight to Walden's subjective claims of pain, which

he found to be credible, than to consultative evaluations performed by state agency physicians. Those physicians apparently concluded that Walden was capable of performing at least sedentary work. Nothing in the ALJ opinion, however, suggests that he would have abused his discretion had he reached a different conclusion. More to the point, nothing in the ALJ decision suggests that Rexam would have acted unreasonably in reaching a different conclusion applying its definition of disability to similarly conflicting evidence.

10. The SSDI decision is, nonetheless, instructive in that it demonstrates that a trained and objective decision maker who had the opportunity to observe Walden and hear her testimony chose to credit her claims of disabling pain. Rexam and its third-party medical reviewer, by contrast, never even discuss the significant evidence relating to Walden's claims of disabling pain. In light of the weakness of the Westerkam Report and the existence of competing evidence, the court finds that it was abuse of discretion for Rexam to rely solely on the Westerkam report and to fail to address other evidence relevant to the same time frame.

11. Rexam should have also considered and addressed the reports prepared by Dr. Poletti. This is not to suggest that these reports require Rexam to find in Walden's favor. Both are relatively cursory (much like the Westerkam Report) and do not appear to be supported by any extensive medical evaluations. Moreover, contrary to Walden's arguments, the evidence suggests that Poletti was consulted for the express purpose of giving an "opinion" more favorable to Walden than she had received from Dr. Westerkam. Nonetheless, particularly given their similarity in quality to Westerkam Report, Dr. Poletti's opinions should have been addressed both as they may relate to the validity of Dr. Westerkam's opinion (Walden's condition in February 1999) and as they relate to other points within the relevant five year period.

12.     There is also other evidence which should have been addressed by Rexam (and its third-party medical reviewer) in determining Walden's dates of disability. For example, Dr. Plunkett acknowledged that Walden had received multiple independent medical examinations after February 1999, at least some of which supported a finding of disability. *See* R/W 725 (summarizing IMEs as follows: December 14, 2000 – listing specific medical findings from IME but not indicating if it contained any disability determination; March 21, 2001 – noting IME concluded that Walden was "considered disabled"; and February 4, 2002 – noting IME concluded that Walden "had not improved since October of 1997").[15] He did not, however, explain why he did not credit these reports to the extent they supported a finding of disability.

13.     This is not to say that the only evidence which was not addressed favored Walden. There is, in fact, other evidence which Dr. Plunkett mentioned which may support the denial of benefits. For example, he noted that an August 2002 FCE found Walden capable of sedentary work. *Id.* He did not, however, explain whether any inference might be drawn from this report as to Walden's probable condition at a significantly earlier time. Neither did he purport to rely on the August 2002 FCE at all. Instead, he relied solely on the February 1999 Westerkam Report and the July 1999 transferable skills analysis which rested on the Westerkam Report in concluding that Walden was not disabled after February 1999. R/W 726.

14.     As noted above, Dr. Plunkett never addressed the impact of Walden's pain or pain treatments on her ability to work. Neither did he address any specific medical records relating to her condition in February 1999, other than the Westerkam Report, or any other evidence of a change in

---

[15] Dr. Poletti's reports were dated February 18, 2000 and February 7, 2001. These dates do not match any referenced in Dr. Plunkett's report. It does not, therefore, appear that Dr. Plunkett considered Dr. Poletti's opinions.

Walden's condition in or around February 1999.  He did not even explain whether or why he found the Westerkam Report to be valid and reliable (or, at least, more so than other reports).  In light of these inadequacies, the court declines to find that Dr. Plunkett's report lends any more support to the denial of benefits than does the Westerkam Report when viewed alone.

15.     Liberty Mutual's October 20, 2006 report recommending denial of the claim does a fairly good job of detailing Walden's medical history and history of her claim for disability retirement benefits.  When it comes to the critical point, however, it simply parrots Dr. Plunkett's opinions.  Thus, it adds nothing to Plunkett's explanation and, likewise, cannot be considered as additional support for the decision to deny benefits.

16.     Rexam's October 23, 2006 letter, likewise, provides a fairly detailed history of Walden's claims but, ultimately, relies solely on the recommendations of Dr. Plunkett and Liberty Mutual for the final denial.  Thus, after much delay and one remand, Rexam, effectively, returns to reliance solely on the February 1999 Westerkam Report, without explanation of its reasons for discounting other evidence of disability.  That explanation is particularly necessary now that the Pension Plan has conceded that Walden met the disability definition through February 1999.

17.     Rexam argues that its decision is also supported by the FCE completed in  August 2002 which found Walden capable of sedentary work.  The primary difficulty with this argument is that the final denial letter merely mentions and does not rely on the August 2002 FCE as a basis for the denial of the claim.  *Compare* R/W 721(noting that August 2002 FCE was consistent with February 1999 FCE) *with* R/W 722 (expressly relying on recommendations of Dr. Plunkett and Liberty Mutual).  *See also* R/W 725-26 (Dr. Plunkett's report mentioning the August 2002 FCE but relying solely on the February 1999 FCE).  Further, while it is possible that some inference might

be drawn from the August 2002 FCE as to Walden's condition in February 1999, that inference is not obvious. Indeed, given Rexam's concession that Plaintiff was totally disabled for nearly two years but then improved sufficiently in February 1999 to return to a sedentary job, it cannot be assumed that her condition would remain unchanged (or only deteriorate, not improve) for the next three and one-half years. Thus, Walden's condition in August 2002 would not necessarily be indicative of her condition in February 1999. In any case, reliance on the August 2002 FCE would require some explanation.[16]

18.     The court, therefore, concludes that Rexam abused its discretion in determining that Walden had ceased to be disabled in February 1999 because it relied solely on the marginal February 1999 Westerkam Report without addressing other, apparently contradictory, evidence.

19.     This does not, however, end the inquiry because the evidence does necessarily require a finding of disability, at least not beyond August 2002. The court, therefore, remands the matter for further consideration of the dates of Walden's disability.

**B.     Benefits for the period May 1997 through February 1999.**

1.     Rexam concedes that Walden was disabled from May 1997 through February 1999, but argues that she is not entitled to benefits under the Pension Plan because she received benefits under the STD Plan for this period. Walden, on the other hand, claims that she did not receive benefits after the first year. Through its sur-reply, Rexam explained why it believed all benefits due were paid (after SSDI offset). By now-stricken argument in response to the mooted motion to compel, both sides continued to argue their respective points.

---

[16] Rexam appears, alternatively, to argue that benefits could be terminated in August 2002 based on the August 2002 FCE. While that may be true, it remains that the Pension Plan has made no such determination. Rather, it is only an argument raised by counsel as to what decisions might have been within the Pension Plan's discretion.

2.    Whether the Pension Plan owes benefits for the period during which it concedes Walden was disabled, therefore, turns on whether the STD Plan paid all benefits due under its separate plan. This, in turn, requires some form of an accounting which may require involvement of the separate STD Plan and, possibly, its third-party administrator.

3.    In light of these considerations, the court cannot decide on the present record whether Walden has received all that is due under Pension Plan, in light of the need to first determine whether she received what was due under the STD Plan. The court, therefore, decides that remand is necessary as to this issue as well.

**C.    Remand**

For the reasons set forth above, the court remands the matter to Rexam, as Plan Administrator of the Pension Plan, to reconsider: (a) its determination that Walden's disability ended on February 1999 (and, alternatively, whether it ended at some later date); and (b) its determination that Walden is not entitled to benefits from May 14, 1997 to February 1999, because she received benefits under the separate STD Plan. Rexam shall issue a new decision on these matters within sixty days of entry of this order.

In addressing the first issue, Rexam shall fully comply with the regulatory requirements governing the claim review process. *See generally* 29 C.F.R. § 2560.503-1(h) (establishing minimum requirements for full and fair review).[17]  In furtherance of these goals, the court expressly

_____

[17] 29 C.F.R. § 2560.503-1 sets minimum standards for claims procedures. Subparagraph (h) addresses standards for internal appeals. Of particular relevance here are subparagraphs (h)(3)(ii), (iii) and (v). Subparagraph (h)(3)(ii) requires an employee benefit plan to "[p]rovide for a review that does not afford deference to the initial adverse benefit determination and that is conducted by an appropriate named fiduciary of the plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual." Subparagraph (h)(3)(iii) requires that a medical professional be consulted in specified circumstances. Subparagraph (h)(3)(v) requires the plan to "[p]rovide that the health care professional engaged for

24

directs Rexam to design any request for a third-party opinion or assistance in a manner that does not suggest a desired (or any prior) result. Materials provided to any third-party reviewer should, likewise, exclude prior opinions and decisions which may suggest a desired result.

All communications to or from any third-party reviewer shall be made available to Walden's counsel within three business days after they are forwarded to or received from the reviewer. In addition to any cover letter or communication, Rexam shall provide Walden with a list (by bates number) of all materials provided to the reviewer.

Rexam (and any reviewers who assist it in the subsequent review) are directed to expressly address the concerns raised by this order (Conclusions of Law § A). As required by 29 C.F.R. § 2560.503-1(h), those involved in the decision making process should, to the extent possible, be individuals not involved with the earlier decision.

If Rexam obtains a report from a medical reviewer, it shall be obtained within thirty days of entry of this order. Rexam shall provide a copy of that report to Walden upon receipt and shall allow her fourteen calendar days to comment before any final decision is issued. The final decision shall take into account and address comments raised by Walden.

As to the benefits for the period May 1997 through February 1999, Rexam is directed to obtain necessary supporting information and provide Walden a full accounting of what benefits should have been paid under the STD Plan. This accounting information shall be provided within thirty days of entry of this order.

───────────────

purposes of a consultation under paragraph (h)(3)(iii) . . . be an individual who is neither an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal, nor the subordinate of any such individual." These provisions, which appear under a section governing medical benefits claims, are also applicable to plans which provide disability benefits. *See* 29 C.F.R. § 2560.503-1(h)(4).

Neither side may submit or obtain any other support except as expressly allowed herein. Specifically, the court will not allow for further supplementation of the record except through the medical reviewer report (limited to review of current record, exclusive of prior plan decisions or related documents which might suggest a desired result)[18] and STD Plan accounting information addressed above.

In the event the decision after this second remand does not resolve the matter, the parties may file supplemental cross-memoranda within fourteen days of issuance of the decision on remand.[19] Any responsive memoranda shall be filed within five business days thereafter. To the extent possible, the parties should refer to the findings of fact contained in the Fact section of this order. Facts found herein should not be reargued.

IT IS SO ORDERED.

s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
June 1, 2007

C:\Documents and Settings\Glp59\Local Settings\Temp\notesE1EF34\06-310 waldenv.rexam  -- F&C w remand.wpd

---

[18]  The new review shall, however, begin with the presumption that Walden was disabled until at least sometime in February 1999. The inquiry is when, if ever, her disability ceased (or recommenced if relevant).

[19]  **In the event further briefing is required, the parties are reminded that both text and footnotes in memoranda should be in 12 point type.** *See* **CM/ECF Preference No. 6 (adopted by all judges of the District).**